306 Ga. 717
FINAL COPY

S19A0860.  WILLIAMS v. THE STATE.

BENHAM, Justice.

Appellant Delwoun Williams was convicted of felony murder and other crimes in connection with the shooting death of Cornelius Gordon.[1] On appeal, Appellant argues that the trial court erred in denying his request to charge the jury on voluntary manslaughter. We conclude that this contention is without merit and affirm.

---

[1] The crimes occurred on June 26, 2017. On September 15, 2017, a Hall County grand jury indicted Appellant for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), felony murder predicated on terroristic threats (Count 3), aggravated assault (Count 4), terroristic threats (Count 5), four counts of possession of a firearm during the commission of a crime (Counts 6-9), and participation in criminal street gang activity (Count 10). At Appellant's May 2018 trial, a jury found him not guilty on Counts 1 and 6 and guilty on all other counts. The trial court sentenced Appellant to serve life in prison for Count 2 and ten years consecutive plus ten years' probation for Count 10, as well as five years' probation for Count 7 to be served consecutively to the other sentences. The trial court purported to merge the remaining verdicts; those rulings have not been challenged on appeal. See *Dixon v.* State, 302 Ga. 691, 698 (808 SE2d 696) (2017).

Appellant filed a motion for new trial on May 14, 2018, and he amended that motion on November 2, 2018. The trial court denied the motion (as amended) on November 15, 2018. Appellant filed a notice of appeal to this Court on November 26, 2018, and this case was docketed in this Court to the April 2019 term and thereafter submitted for a decision on the briefs.

Viewed in the light most favorable to the verdicts, the evidence at trial showed that Appellant (also known as "Mad Max" and "Maximilian") was a member of the Bloods gang and, around the time of the crimes, was reportedly selling a significant amount of marijuana. The victim, Cornelius Gordon, was a member of another gang, the Gangster Disciples, and he made a living as a marijuana distributor.

On the evening of June 25, 2017, Gordon rode with his friend Angela Seecharan and Seecharan's friend Linda Santana, an associate of the Bloods gang, to "the main [Bloods'] trap house on Dean Street" in Gainesville, Georgia. Later, Seecharan drove the trio to a nightclub. While Seecharan and Gordon were sitting in the car in the club's parking lot, Santana exited the club with Daquan Henderson, also a member of the Bloods gang, who asked Seecharan for a ride.

At Henderson's direction, Seecharan drove the group of four to several locations around town before arriving at a mobile home on Barnes Street around 2:00 a.m. where a group of 10 to 15 people was

standing outside. As Henderson exited the car, Seecharan heard gunshots and noticed a short, black male in his early twenties with shoulder-length dreadlocks standing near Gordon's front-passenger window.[2] She also heard someone scream, "I told y'all n****rs, I told y'all, y'all thought this was a game." Seecharan then noticed that Gordon was slumped to the side with a bullet hole in his head; at that point, she drove the car to the hospital where Gordon died several hours later as a result of his injury.

Seecharan testified that Santana told her she saw "Max" shoot his gun three times. Seecharan looked for Appellant on social media and found a profile for "Maximilian" with a picture showing the person Santana saw shooting. Seecharan gave this information to investigators. At trial, Seecharan confirmed that Appellant was the person in the picture.

The morning after the crime, investigators located Appellant at a hotel, where they took him into custody and questioned him. In

---

[2] Photographs of Appellant taken at his arrest matched Seecharan's description of the shooter.

statements recorded by investigators, Appellant offered multiple accounts of what happened the previous night. Though he claimed he did not own a gun, a holster was found on his person during his arrest. Appellant eventually admitted to owning a gun and to firing a gun three times, claiming that he was shooting back at gunfire coming from a truck. Appellant indicated that the bullets he fired were full metal jackets, which, as an investigator noted at trial, were consistent with four of five shell casings recovered at the crime scene.[3] The location at which the casings were found was consistent with Appellant's account of the direction he ran as he fled the scene.

Jeremiah Words, a former associate of the Bloods gang, was arrested in March 2018 on a charge unrelated to the crimes at issue here. During questioning subsequent to his arrest, he told investigators where Appellant hid the gun. Words later testified at trial that Appellant was armed with a nine-millimeter handgun on the night of the crimes. When the shooting occurred, Words fled the

---

[3] Investigators noted that the fifth shell casing appeared "to be more weathered" compared to the other casings.

mobile home, and Appellant went with him, commenting that he did not want to be walking around "with that big a** gun on him." Words and Appellant walked around Gainesville and eventually went to the home of the grandmother of Brandon Yarbrough, another Bloods associate. Words and Appellant left cash, marijuana, and the gun with Yarbrough; while there, Appellant commented that "they was shooting at us, so I started shooting back." After leaving Yarbrough, Words and Appellant got a hotel room together. While watching television, they saw coverage of the shooting, and Appellant said he "couldn't have did that because [his] first shot hit [Seecharan's] back door."[4] Words also noted that, as the night went on, Appellant "just got sketchy. He got paranoid."

When Seecharan's car was processed, a bullet was found in the back of the driver's seat, lodged in the frame; investigators determined, based on the bullet's trajectory, that it came through the rear passenger-side door. A second bullet, which hit Gordon,

---

[4] According to law enforcement, details regarding the bullets' points of impact were not released to the public.

came through the front passenger-side window.

Law enforcement located a nine-millimeter handgun in Yarbrough's grandmother's back yard, where it had been buried along with live ammunition; the gun was wrapped in a rag and placed in a plastic bag. A firearms examiner determined that four of the five shell casings recovered from the crime scene were consistent with having been fired from the gun. Moreover, the recovered ammunition was consistent with the shell casings recovered at the scene. Two copper jackets found in Seecheran's car were determined to have been fired from the gun.

At trial, the State introduced letters that Appellant wrote from jail to Words and Santana that were intercepted. In the letter to Words, Appellant asked Words to take the stand and pin the blame on another Bloods member, Xavier Neal. Appellant's letter to Santana included a similar request.

Appellant's defense at trial was one of mistaken identity; he posited that Neal was responsible for Gordon's death. Appellant admitted to owning a nine-millimeter handgun and to having it in

his possession before the crimes, but he claimed that he and Neal switched guns earlier in the evening, at Neal's request. Appellant also testified that he fired his weapon into the air twice "as like a warning" when he heard gunshots coming from the street. Santana testified for the defense, explaining that she saw Appellant standing ten feet from Seecharan's car shooting his gun in the air. Santana denied knowing who shot into the car.

1. Though not enumerated as error by Appellant, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that the evidence summarized above was sufficient to authorize a rational trier of fact to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. In his sole enumeration of error, Appellant argues that the trial court erred in denying his request to charge the jury on voluntary manslaughter. We disagree.

As an initial matter, although Appellant objected at the charge

conference to the trial court's refusal to give the requested charge, he failed to object after the jury was charged. Accordingly, we review for plain error only. See *White v. State*, 291 Ga. 7, 8 (2) (727 SE2d 109) (2012) ("Because an objection voiced at the charge conference does not preserve objections to the charge as subsequently given, the failure to object to the charge as given precludes appellate review unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties." (citation and punctuation omitted)).

"When reviewing a jury instruction for plain error that has not been affirmatively waived, the proper inquiry is whether the instruction was erroneous, whether it was obviously so, and whether it likely affected the outcome of the proceedings." (Punctuation omitted.) *Manning v. State*, 303 Ga. 723, 727 (3) (814 SE2d 730) (2018) (citing *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011)). If an appellant demonstrates that the trial court's failure to give an instruction constitutes such error, an appellate court may exercise its discretion to correct the error only if the error seriously

affects the fairness, integrity, or public reputation of judicial proceedings. *Kelly*, 290 Ga. at 33.

A person commits voluntary manslaughter "when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]" OCGA § 16-5-2 (a). Notably,

> [t]he provocation necessary to support a charge of voluntary manslaughter is markedly different from that which will support a self-defense claim. The distinguishing characteristic between the two claims is whether the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself. Only where this is shown will a charge on voluntary manslaughter be warranted.

(Punctuation omitted.) *Allen v. State*, 290 Ga. 743, 746 (4) (723 SE2d 684) (2012).

At trial, Appellant testified that, when he "heard gunshots coming . . . [he] fired the shots as like a warning," and that, after hearing gunshots, he "removed [his] gun and . . . fired two shots in

9

the air." The State also introduced into evidence recordings of Appellant's interviews with law enforcement. In these recordings, Appellant claimed that "bullets [were] just flying everywhere. And it was like, *I'm trying to protect myself*." (Emphasis supplied.) He further claimed that he "fired [his weapon] to cover [his] a\*\* to get away" and that he was "not trying to hit nobody. [He was] trying to cover [his] a\*\*. . . . [He was] just protecting [himself]."

"At best, this evidence shows that [Appellant] was attempting to repel an attack, not that he was so angered that he reacted passionately." *Bell v. State*, 280 Ga. 562, 567 (5) (a) (629 SE2d 213) (2006). Such evidence is insufficient to warrant a charge on voluntary manslaughter. See id. Accordingly, the trial court did not err in refusing Appellant's charge on voluntary manslaughter, and this claim fails.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 3, 2019.
Murder. Hall Superior Court. Before Judge Deal.
*Juwayn Haddad*, for appellant.

*Lee Darragh, District Attorney, Laura K. Lukert, Wanda L. Vance, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.