NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 12, 2025

S25A0849. HENDERSON v. STATE

COLVIN, Justice.

Appellant Sean Henderson appeals his convictions for malice murder and other crimes related to the shooting death of Derrick Hinton.[1] On appeal, Appellant argues that the trial court erred when it failed to instruct the jury on the lesser offense of voluntary

---

[1] The crimes occurred on August 29, 2019. On November 21, 2019, a DeKalb County grand jury returned a four-count indictment against Appellant for malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), and possession of a firearm during the commission of a felony (Count 4). A jury trial was held from February 7 to 9, 2022, and the jury found Appellant guilty on all counts. The trial court sentenced Appellant to life for malice murder (Count 1) and five consecutive years in prison for possession of a firearm during the commission of a felony (Count 4). All other counts merged or were vacated by operation of law.

Appellant filed a motion for new trial through new counsel on March 7, 2022, and amended his motion through different counsel on May 5, 2024. The trial court denied Appellant's motion for new trial on May 15, 2024. Appellant filed a timely notice of appeal to this Court on May 17, 2024. The appeal was docketed to this Court's April 2025 term and was submitted for a decision on the briefs.

manslaughter, that the prosecutor's comments on his statement that he would speak with an attorney during a pretrial interrogation constituted reversible error, and that trial counsel was ineffective for failing to object to testimony concerning his invocation of the right to counsel and for failing to request a curative instruction. We affirm Appellant's convictions for the reasons explained below.

In August 2019, Appellant and Hinton lived in different rooms in the same motel. Hinton lived there along with his girlfriend, Precious Hector, and her three daughters, the youngest of whom she shared with Hinton. According to Appellant, Hector approached him one day and asked to purchase some marijuana. Appellant testified that he refused and that this refusal created a rift between Appellant and Hinton. According to Appellant, this rift was apparent on at least three subsequent occasions. On the first occasion, Appellant was crossing a street to go to a store when he saw Hinton. According to Appellant, Hinton looked at him "violently" and "moved into [a] position" that temporarily blocked Appellant from opening the store's door "all the way[.]" On the

2

second occasion, Appellant was waiting at a bus stop when Hinton walked towards him from across the street, staring at him "violently" and "up and down" in a manner that felt "threatening" to Appellant. The third occasion took place at the motel while Appellant was getting ice from a machine. According to Appellant, Hinton came and "walk[ed] right up on [Appellant's] shoulder" and "put his chest . . . or . . . his stomach . . . on [Appellant,]" causing him to drop his ice. Appellant testified that when he turned around, both he and Hinton stared at each other in a "threatening" manner, and that as Hinton turned away, Hinton "lift[ed] up his elbow" as if to hit Appellant. Appellant testified that each run-in with Hinton caused him to wonder whether he needed to "defend [him]self."

Sometime later that same month, Appellant took his gun with him to pay his motel bill. He testified that, on the way, he saw that Hector and Hinton's door was "open" and thought he would go "check[ ] on [Hinton]." Appellant further testified that he saw Hinton sweeping inside. As Appellant stood "in the doorway[,]" he asked Hinton if "everything [was] all right[.]" Hinton responded in

3

the affirmative, and Appellant asked whether the two could speak further to "iron . . . out" their "differences[.]" Appellant testified that Hinton began to grow angry, that he approached Appellant with a broom, and that Appellant began to feel "afraid," especially because Hinton was significantly larger than him. According to Appellant, Hinton was "doing all this yelling, causing all this commotion," and "deliberately" "spitting out of his mouth while he was talking[.]" Appellant further testified that he "couldn't believe" that Hinton was "taking [the situation] th[at] far." At some point during the encounter, Appellant dropped his jacket. As Appellant reached down to pick it up before making to leave, Hinton "stepped in front of [him]." Appellant picked up his jacket "quick[ly]" and then put his hand into his backpack, where he had stored his gun. Appellant testified that when Hinton noticed that Appellant had a gun, Hinton said, "I don't give a f**k." Appellant further testified that, in that moment, the men were "face-to-face[,]" and it was "a race" between Hinton "hitting [him]" and Appellant "defending [him]self." According to Appellant, he shot Hinton as Hinton was "in motion"

4

with the broom.

P. H., Hector's teenage daughter was in the room with Hinton during the altercation. According to P. H., it appeared as though Appellant had no particular "subject" to discuss with Hinton. She described Appellant's voice as "soft" and "faded at first" as he asked Hinton questions along the lines of, "Are you okay man?" "Are you fine?" and "How's your day going?" P. H. further testified that Hinton responded, "No, I'm okay, man, I just woke up[.]" Up to that point, P. H. testified, there was "no argument" until Appellant told Hinton, "You look like something's wrong with you" and then asked Hinton, "What's wrong with your face[?]" P. H. further testified that Hinton "got weird by it" and "got real loud[,]" questioning why Appellant kept asking him what was "wrong" with him. According to P. H., as the conversation between Hinton and Appellant got louder, she went toward the door where Hinton and Appellant were standing. P. H. testified that she did not see the entire encounter, but she reported hearing four gunshots and seeing the final shot, which she said hit Hinton in the stomach once "he got to the

ground[.]" According to P. H., when Hinton fell at her feet, she saw Appellant's "gun[,]" "face[,]" and distinctive gait as he walked away. P. H. also testified that she identified Appellant in a photograph as the shooter for law enforcement officers. And at trial, Hector, who was on the other side of the motel at the time of the shooting, testified that she saw Appellant walking away from the scene after hearing gunshots.

The medical examiner testified that Hinton sustained three gunshot wounds: one to the chest, one to the hand, and one to the left side of the back. According to the medical examiner, Hinton died of a gunshot wound to the torso shortly after the shooting.

Appellant testified at trial that his acquaintance, Brandon Brooks, helped him move out of his motel room and into another motel the day after the shooting. Brooks testified that, on the ride to the new motel, Appellant told Brooks that he "got into a scuffle with a guy" and that he "basically, had to protect himself[.]" But Detective J.B. Williams testified that Brooks's account of the discussion during the car ride was different in his pretrial interview with him.

Detective Williams's interview with Brooks was played in open court, and in it, Brooks and Williams engaged in the following colloquy:

> DETECTIVE WILLIAMS: Alright, tell me exactly what he told you.
> BROOKS: [H]e beat around the bush. He didn't tell me too much details. He literally said, "I got in it with this dude, and then I seen him one day, and he said something smart, so I busted at him six times."
> DETECTIVE WILLIAMS: Okay. And that was his exact words?
> BROOKS: Yep.

Appellant was arrested shortly after he and Brooks arrived at the second motel. Law enforcement officers found several items in Appellant's room, including a backpack and a gun that was later identified as the murder weapon.

1. Appellant contends that the trial court erred when it failed to instruct the jury on the lesser offense of voluntary manslaughter upon request. We disagree.

Under Georgia law, a person commits the offense of voluntary manslaughter when he or she "causes the death of another human being under circumstances which would otherwise be murder" and

7

"acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]" OCGA § 16-5-2 (a). "A trial court must grant [a] defendant's request for a charge on . . . voluntary manslaughter if there is any evidence, however slight, to support such a charge." *Allen v. State*, 319 Ga. 415, 419–20 (2024) (citation and punctuation omitted). We have held that

> a charge on voluntary manslaughter is warranted only where it can be shown that the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself. A charge on voluntary manslaughter is not available to a defendant whose own statement unequivocally shows that he was not angered or impassioned when a killing occurred, and when the other evidence does not show otherwise.

*Ward v. State*, 318 Ga. 884, 893 (2024) (citations omitted). And we have further held that "[n]either fear that someone is going to pull a weapon nor fighting are the types of provocation which demand a voluntary manslaughter charge." *Allen*, 319 Ga. at 426 (citation and punctuation omitted). This is not to say that "a defendant's claim of self-defense . . . preclude[s] an alternative claim of voluntary

8

manslaughter." Id. As we have made "clear," when "there is some evidence to support more than one theory, a defendant who pursues alternative defense theories is entitled to requested charges on both theories." Id. at 427 (citation and punctuation omitted). But, as relevant here, for a voluntary manslaughter charge to be warranted, there must be at least "slight evidence that the defendant, in killing the victim, acted under a serious provocation that could excite a sudden, violent, and irresistible passion in a reasonable person." *Anderson v. State*, 319 Ga. 56, 61 (2024) (citations and punctuation omitted). And "words alone, regardless of the degree of their insulting nature, will not in any case justify the excitement of passion so as to reduce the crime from murder to manslaughter." Id. at 443 n.25.

Here, the trial court did not err in failing to charge the jury on voluntary manslaughter because Appellant's own testimony showed that, at most, he was fearful and attempting to defend himself when he shot Hinton, not that he was angered or impassioned. Appellant testified that there was a "race" between Hinton hitting him and

Appellant "defending [him]self." He further testified that he was "afraid, threatened," and of the belief that Hinton might "beat [him] up or beat [him] with the broom." Moreover, there was no evidence that Appellant was provoked in a way that supported a voluntary manslaughter instruction. Accordingly, the trial court was not required to charge the jury on voluntary manslaughter. See *Ward*, 318 Ga. at 891–93 (holding that a voluntary manslaughter charge was not warranted when the appellant denied shooting the victim out of "heat of passion" and instead testified that it was "him or me" and that he shot the victim because he was "scared for his life" after the two "tussled" and the victim had a gun (punctuation omitted)); *Williams v. State*, 306 Ga. 717, 721 (2019) (holding that a voluntary manslaughter charge was not warranted when the evidence showed that the defendant "was attempting to repel an attack, not that he was so angered that he reacted passionately" (citation omitted)); *Burke v. State*, 302 Ga. 786, 790–91 (2018) ("[A]cting out of fear of bodily harm is not the same as acting in the heat of passion, and only evidence of the latter supports a voluntary manslaughter

10

conviction."); *Baugh v. State*, 293 Ga. 52, 55 (2013) (holding that no voluntary manslaughter instruction was warranted when, according to the appellant, he shot the victim out of "reflex" after the victim "fir[ed] a gun in his direction").

Appellant, however, compares his case to *Webb v. State*, 284 Ga. 122 (2008), to support his argument that the trial court erred by failing to charge the jury on voluntary manslaughter. Specifically, Appellant argues that "[w]ords connected with other acts or provocative conduct, such as aggressive behavior or physical violence, *can* form the basis of the required 'slight' evidence." In *Webb*, trial evidence showed that the defendant "overreacted" and fatally stabbed one of his house guests after a "confrontation" arose between them, and we held that the trial court erred in failing to give a voluntary manslaughter charge. Id. at 126.

Appellant argues that his case is similar to *Webb* in that there is "ample evidence that [he] and Hinton were arguing," that Hinton blocked Appellant from leaving, and that Appellant believed that Hinton was going to "beat" him with a broom. *Webb*, however,

11

contains a key fact that Appellant lacks: evidence that the defendant reacted out of passion. Webb admitted to "overreact[ing]" in his police statement. *Webb*, 284 Ga. at 126 n.4. And that admission, in addition to evidence of the confrontation, constituted slight evidence that Webb acted out of heat of passion. Id. Here, on the other hand, no evidence showed that Appellant reacted solely out of passion. See *Tarpley v. State*, 298 Ga. 442, 445 (2016) (holding that a voluntary manslaughter charge was not warranted when "[the appellant's] statements to police and trial testimony d[id] not indicate that he killed [the victim] out of some irresistible passion — whatever the source of that passion — but, instead, that the killing occurred because [the appellant] was 'very afraid' of [the victim] that night"). Accordingly, *Webb* is factually distinct, and Appellant's reliance on it is unavailing.

Appellant also cites *Washington v. State*, 249 Ga. 728 (1982), for the proposition that evidence of a victim's ongoing conduct toward the accused can support a voluntary manslaughter charge. See id. at 730 (holding that the trial court erred in failing to give a

voluntary manslaughter instruction when the victim cut the neck of Washington's son and days later, "was *continuing* to make threats and taunts against the life of [Washington's] son" (emphasis supplied)). Appellant points to his three previous encounters with Hinton and claims that, at the time of the shooting, Hinton was exhibiting some of the same threatening behavior he had exhibited in the past. And Appellant asserts that, as in *Washington*, the jury should have been instructed on voluntary manslaughter.

*Washington* is distinguishable from the present case, however, and does not support Appellant's claim that the trial court erred in failing to give a voluntary manslaughter charge. In *Washington*, we held that the trial court erred in failing to give a voluntary manslaughter instruction when there was evidence that the victim made threats against the Appellant's son's life. *Washington*, 249 Ga. at 730. But here, unlike in *Washington*, there is no evidence that Hinton made threats against any of Appellant's loved ones, which might generate a passion sufficient to warrant an instruction on voluntary manslaughter. Compare *Allen v. State*, 319 Ga. 415, 418,

13

423 (2024) (holding that a charge on voluntary manslaughter was warranted when there was evidence amounting to a reasonable belief that adulterous conduct had occurred between the victim and the appellant's wife, including evidence that when the appellant asked the victim why he, as a married man, was "f\*\*king up" the appellant's family, the victim responded, "man, f\*\*k you" with a "smirk on his face"); *Scott v. State*, 291 Ga. 156, 157 (2012) (holding that a voluntary manslaughter charge was warranted when the "appellant proffered evidence supporting an inference that he shot the victim in the heat of passion during a confrontation about the victim's molestation of [the] appellant's niece"). Accordingly, *Washington* does not support Appellant's claim.

2. Appellant also argues that the trial court erred when it permitted the prosecutor to ask a detective questions about Appellant's statement made during his interrogation that he would "talk to" an attorney. Appellant further asserts that the trial court erred when it failed to give a curative instruction. These claims fail.

During the direct examination of Detective Chris Tappan, the

14

prosecutor played an audio recording of Appellant's interview with him and another detective after Appellant was taken into custody. The recording captured Appellant's oral waiver of his rights under *Miranda v. Arizona,* 384 US 436 (1966), prior to the interview, as well as the detectives' assurance that Appellant could "stop" the interrogation "whenever [he] want[ed] to." The recording further revealed that Appellant answered the detectives' questions for approximately 20 minutes without hesitation. But when a detective asked Appellant, "[W]hen was the last time you saw [Hinton]?" Appellant responded, "Imma talk to a lawyer about that, the last time I saw him." The interrogation continued:

> DETECTIVE: Are there any other questions you want to answer, or do you want to refer to an attorney?
> APPELLANT: If you got any questions for me — if I feel I should talk to a lawyer, then I'll just let you know.
> . . .
> DETECTIVE: Have you shot the — gun that you have recently?
> APPELLANT: I'll talk to a lawyer about that.
> DETECTIVE: I mean, not necessarily at a person. Have you just discharged it recently?
> APPELLANT: I'll talk to a lawyer about that.
> . . .
> DETECTIVE: [W]hat made you leave the [motel]

15

yesterday?
APPELLANT: What made me leave? I'll talk to a lawyer about that.

A detective asked Appellant only two other general questions about how he was able to get back into the motel the day after the shooting, which Appellant answered without hesitation. After Appellant answered those questions, the detective stated that it appeared Appellant was beginning to "not want[ ] to answer a lot of questions[.]" And Appellant responded, "I'll just talk to an attorney and see where it goes from there." The detectives did not ask Appellant any other questions past that point of the recording.[2]

After the recording was finished playing, the prosecutor examined Detective Tappan as follows:

PROSECUTOR: It's your understanding that at that time he invoked his right to an attorney.
DETECTIVE TAPPAN: That's — it depends on your interpretation of what he just said.
PROSECUTOR: He did invoke his rights to an attorney

---

[2] Appellant asserts that his statement that he would "talk to" an attorney was an invocation of his right to counsel. And the State does not contest that Appellant invoked that right. Accordingly, we assume without deciding that Appellant's statement that he would "talk to" an attorney invoked a constitutional right which prohibited the State from using his silence against him.

at that time; Correct?
DETECTIVE TAPPAN: He said I need to talk to a lawyer about that, specifically, about that question, which he did not want to answer the question.

Trial counsel did not object to this line of questioning during trial.

The United States Supreme Court has held that when a defendant is taken into custody, prior to being questioned, he must be "warned . . . that he has the right to remain silent[.]" *Miranda*, 384 U.S. at 479. "To use a defendant's custodial statements in its case-in-chief, the State must show that the defendant was advised of his *Miranda* rights and that he voluntarily, knowingly, and intelligently waived them." *Hinkson v. State*, 310 Ga. 388, 400 (2020) (citation omitted). "[T]he use for impeachment purposes of [an accused's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 US 610, 619 (1976). "With respect to post-*Miranda* warnings 'silence,' . . . silence does not mean only muteness; it [also] includes the statement of a desire . . . to remain silent until an attorney has been consulted." *Wainwright v.*

*Greenfield*, 474 US 284, 295 n.13 (1986).

(a) Appellant argues that the prosecutor's questions — and the detective's response — violated Appellant's due process rights under *Doyle*. Specifically, Appellant asserts that "twice" the State "intentionally elicited" testimony meant to "imply his guilt — that he was willing to speak with law enforcement until the topic of Hinton came up, at which point he wanted to speak with a lawyer, because he had done something wrong."

Because Appellant failed to object during trial and preserve this specific issue for appeal, we review only for plain error.[3] See *Holloway v. State*, 320 Ga. 668, 670 (2025) (reviewing the appellant's

---

[3] Appellant filed a motion in limine to suppress Appellant's statement to Detective Tappan on the ground that it was "not freely and voluntarily given and that [he] was not informed and/or did not understand" his rights under *Miranda*. While Appellant's motion in limine challenged the admission of Appellant's *statement* for the aforementioned reasons, it did not specifically challenge the admission of *testimony* pertaining to Appellant's invocation of the right to counsel for impeachment purposes in violation of *Doyle*. Accordingly, our review is limited to plain error. See *Madera v. State*, 318 Ga. 593, 595 n.3 (2024) ("Although a party does not waive an error by failing to object to admission of evidence after a motion in limine is denied, this rule cannot be invoked to preserve a different, if perhaps related, error." (citation and punctuation omitted) (quoting *Williams v. Harvey*, 311 Ga. 439, 452 (2021))).

18

constitutional claim only for plain error when the appellant "failed to object to the trial court's actions or otherwise seek to exclude th[e] evidence at trial"); *Dunbar v. State*, 309 Ga. 252, 256 (2020) (applying the plain error standard of review when the appellant "did not object to the trial court on the constitutional grounds she" raised on appeal). To show plain error, an appellant

> must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

*Render v. State*, 320 Ga. 890, 899 (2025) (citation and punctuation omitted). "If one prong of the plain error test is not satisfied, we need not address the other prongs of the test." *Baker v. State*, 319 Ga. 456, 462 (2024).

Here, the trial court did not plainly err because Appellant has not shown that the alleged error likely affected the outcome of his trial. In light of the strong evidence against him, it is unlikely that the detective's testimony about Appellant wanting to speak with a

19

lawyer had an effect on the jury's verdict. See *Henderson v. State*, 317 Ga. 66, 80 (2023) (holding that the admission of a statement which the defendant contended violated his Confrontation Clause rights "was unlikely to have affected the outcome of the trial" given the "otherwise strong case against [him]"); *Jones v. State*, 317 Ga. 466, 473 (2023) (holding that, "[e]ven assuming . . . it was clear error to admit the portions of [a] video recording that [the appellant] contend[ed] contained commentary on his silence . . . any error did not affect [his] substantial rights" because the appellant's "silence in the face of the investigators' questions and comments was cumulative of other properly admitted evidence at trial and was harmless in light of the substantial evidence of [his] guilt"). This evidence included that Appellant, while armed with a gun, took it upon himself to "check[ ] on" Hinton — with whom he had previous tense encounters — when he saw that Hector and Hinton's room door was open. See *Morris v. State*, 301 Ga. 702, 704 (2017) (holding that there was sufficient evidence of malice aforethought when, "[p]rior to the shooting, [the defendant] acquired a gun and then

20

headed to the house" where the victim was located and shot him "numerous times . . . even after he had already fallen to the ground"). The evidence also included testimony from P. H. that Appellant did not have a particular "subject" to discuss when he approached Hinton other than to ask Hinton what was "wrong with [his] face[.]" And other evidence included a recorded interview in which Brooks told Williams that Appellant said he "busted at [Hinton] six times" because Hinton said "something smart." See *Anderson v. State*, 319 Ga. 56, 61 (2024) ("[T]hreats and insults on their own are not enough to support a voluntary manslaughter instruction."). Altogether, any prejudice arising from the prosecutor's questions and the detective's response did not likely affect the outcome of Appellant's trial because the evidence showing that he acted with malice aforethought was strong. Appellant therefore cannot show plain error.

(b) Appellant also argues that the trial court erred in failing to give a curative instruction after the prosecutor's colloquy with the detective. This claim is also reviewed for plain error because

Appellant failed to request a curative instruction during trial. See *Wynn v. State*, 313 Ga. 827, 830 (2022) ("Because [the appellant] did not raise any objection regarding the . . . evidence at trial and did not request a curative instruction, we review these issues only for plain error."). Under the third prong of plain error review, Appellant cannot show that the trial court's failure to, sua sponte, give a curative instruction likely affected the outcome of his trial for the reasons explained above. Accordingly, Appellant's claim fails.

3. Finally, Appellant argues that trial counsel was ineffective for failing to object to evidence regarding his statement that he would "talk to" an attorney and for failing to request a curative instruction. For the reasons explained below, Appellant has waived these claims.

After Appellant was convicted, his trial counsel filed a motion for new trial. He then filed an amended motion for new trial through new counsel who represented him at the hearing for the amended motion. Appellant raised several ineffective assistance claims in his amended motion for new trial and at the hearing but did not raise

22

the claims, which he currently asserts on appeal. Appellant's current counsel entered an appearance after the trial court denied Appellant's motion for new trial and a notice of appeal was filed to this Court.

Under Georgia law,

> in order to avoid a waiver of a claim of ineffective assistance against trial counsel, the claim must be raised at the earliest practicable moment, and that moment is before appeal if the opportunity to do so is available. The pre-appeal opportunity is "available" when the convicted defendant is no longer represented by the attorney who represented him at trial.

*Sturkey v. State*, 319 Ga. 156, 162 (2024) (citation and punctuation omitted).

Appellant argues that the ineffective assistance claims he now asserts were not waived because his current counsel did not "participate in the motion for new trial" and entered an appearance only after the notice of appeal had been filed. To support his argument, Appellant compares his case to *Johnson v. State*, 259 Ga. 428, 429 (1989), overruled in part on other grounds by *Wilson v. State*, 277 Ga. 195 (2003). In *Johnson*, the defendant's appellate

23

counsel "filed an appeal [to this Court] from the denial of [a] motion for new trial filed by trial counsel" and raised the issue of ineffective assistance for the first time on appeal. Id. at 429. Thereafter, the State requested "that the case be remanded for an evidentiary hearing" in the trial court on the issue of ineffective assistance. Id. We granted the State's request and reasoned that

> the requirement . . . that an evidentiary hearing must be requested at the time of an amended motion for new trial does not apply to a case where the appellate counsel did not participate in the motion for new trial, and the issue of ineffectiveness of counsel is raised for the first time on appeal.

Id.

Appellant suggests that, just as an evidentiary hearing on an ineffective assistance claim raised for the first time on appeal can be requested when new counsel takes over after the denial of a motion for new trial filed by trial counsel, Appellant should be able to raise new ineffective assistance claims because his current counsel did not participate in the motion for new trial stage. We disagree.

The earliest practicable moment for Appellant to raise the

24

ineffective assistance claims he now asserts was in his amended motion for new trial after he was no longer represented by trial counsel. See *Williams v. State*, 298 Ga. 538, 540 (2016) (holding that the appellant's ineffective assistance claims were waived when they were neither "asserted by him in his amended motion for new trial filed after he obtained new counsel" nor "raised at the hearing on his amended motion for new trial"). Moreover, Appellant's case is distinguishable from *Johnson* because in that case, appellate counsel entered an appearance after *trial counsel* represented the defendant throughout the entire motion for new trial stage. But here, new counsel, rather than trial counsel, filed Appellant's amended motion for new trial, making it the earliest practicable moment for Appellant to raise the ineffective assistance claims he now asserts.

And though Appellant raised several ineffective-assistance claims in his amended motion for new trial and at the motion for new trial hearing, Appellant never asserted that his counsel was ineffective for failing to object to the prosecutors' questions and

25

failing to request a curative instruction. Accordingly, these claims are waived. See *Berry v. State*, 321 Ga. 251, 255 (2025) (holding that, because the appellant asserted for the first time on appeal that his counsel was ineffective for a different reason than he asserted in his motion for new trial, his claim was waived).

*Judgment affirmed. All the Justices concur, except Land, J., not participating.*